# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

EMANUAL JAMES PEAVY,

Petitioner,

v.

RAYMOND MADDEN, Warden,

Respondent.

Case No.:  19cv0743-MMA (BGS)

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

Emanual James Peavy ("Petitioner") is a California state prisoner proceeding pro se and in forma pauperis with a Second Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 13.)  Petitioner was convicted in San Diego County Superior Court of one count each of first degree murder and attempted murder, which a jury found were committed with the personal use of a firearm and for the benefit of, at the direction of, or in association with a criminal street gang, and was sentenced to 50 years to life plus 39 years in state prison.  (*Id*. at 21-22.)  He claims here that his federal constitutional right to due process was violated by the admission of evidence which was more prejudicial than probative and rendered his trial fundamentally unfair (claims one and three), and his federal constitutional right to self-representation was violated by the denial of his post-trial motion to represent himself as untimely without a proper inquiry or sufficient factual findings (claim two).  (*Id*. at 13-17.)

Warden Raymond Madden ("Respondent") has filed an Answer and a Notice of Lodgment.  (ECF Nos. 18-19.)  Respondent contends federal habeas relief is unavailable because the state court adjudication of claims one and two is neither contrary to, nor an unreasonable application of, clearly established federal law; any error regarding claim two is harmless; and claim three should be denied as plainly meritless notwithstanding a failure to exhaust state court remedies.  (ECF No. 18-1 at 3-8.)

Petitioner has filed a Traverse.  (ECF No. 23.)  He replies that the denial of claim one by the state court, on the basis that the introduction of the challenged evidence did not violate federal due process because it was material and not prejudicial, is contrary to or an unreasonable application of federal evidentiary rules and laws which require exclusion of prejudicial evidence which result in a fundamentally unfair trial.  (*Id*. at 9-16.)  He argues the state court adjudication of claim two, on the basis that his right to self-representation was not violated by a summary denial of his motion to represent himself as untimely, is contrary to or an unreasonable application of federal law requiring an inquiry or findings whether the request would have disrupted the proceedings or if a continuance should have been granted to allow him to develop his ineffective assistance of counsel claims.  (*Id*. at 3-4, 17-18.)  Petitioner filed a notice to withdraw claim three as unexhausted before the Answer was filed, and it is not addressed in the Traverse.  (ECF No. 17.)

For the following reasons, the Court finds federal habeas relief is unavailable because the state court adjudication of claims one and two is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts, and claim three, to the extent it is before the Court, fails on its merits.  The Second Amended Petition is therefore denied.[1]

---

[1] Although this case was referred to United States Magistrate Judge Bernard G. Skomal pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter.  *See* S.D. Cal. Civ.L.R. 72.1(d).

# I.    PROCEDURAL BACKGROUND

On April 30, 2015, Petitioner and co-defendant Lamont Holman were charged with the murder of Gregory Benton and the attempted murder of J.R.  (ECF No. 19-1 at 9-11.)  It was alleged that Petitioner personally used a firearm during both offenses and committed them for the benefit of, at the direction of, or in association with a criminal street gang.  (*Id*.)  Holman pleaded guilty.  (ECF No. 19-5 at 6.)

On August 8, 2016, a jury found Petitioner guilty on both counts and returned true findings on both allegations.  (ECF No. 19-1 at 230-33.)  On September 6, 2016, the day set for sentencing, the trial judge held a *Marsden*[2] hearing at Petitioner's request, which Petitioner argued was a *Faretta*[3] motion arising from claims of ineffective assistance of appointed trial counsel which he needed time to investigate.  (ECF No. 19-18 at 3-16.)  The motion was denied as untimely, and he was immediately sentenced to 50 years to life plus 39 years in state prison.  (ECF No. 19-1 at 236-38.)

Petitioner appealed, alleging, as he does in claims one and two here, that his federal constitutional rights were violated by: (1) the introduction of evidence of his involvement in a similar shooting (resulting in an attempted murder conviction) which took place three days after the shooting for which he was on trial, because, notwithstanding a jury instruction the evidence was introduced for the limited purpose of showing identity, intent and motive, it was cumulative to trial evidence on those issues and amounted to a piling on of unnecessarily prejudicial evidence; and (2) the denial of his unequivocal motion for self-representation as untimely without an inquiry or findings concerning how granting the request would have disrupted the proceedings or whether a continuance should have been

---

[2]  *People v. Marsden*, 2 Cal.3d 118, 123 (1970) (holding that defendants represented by appointed counsel may discharge their attorneys and substitute new counsel if their right to counsel would be substantially impaired by continuing with the original attorney).

[3]  *Faretta v. California,* 422 U.S. 806, 807 (1975) (holding that a criminal defendant has a federal constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so).

granted to allow him to develop his ineffective assistance of counsel claims. (ECF No. 19-19.)  On January 30, 2018, the appellate court denied the claims on their merits in a written opinion and affirmed in all respects.  (ECF No. 19-21.)

Petitioner presented the same claims in a petition for review in the state supreme court.  (ECF No. 19-22.)  On April 11, 2019, the state supreme court denied the petition. (ECF No. 19-23.)

## II.   **TRIAL PROCEEDINGS**

The following statement of facts is taken from the appellate court opinion affirming Petitioner's conviction on direct review.  This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. 539, 545-47 (1981).

*Prosecution Case*

J.R. testified that on April 12, 2014, at about 10:40 p.m. she was driving home with her cousin, Gregory Benton.  She parked her vehicle and she and her cousin walked towards her family's house.  She saw a black car approaching them.  Suddenly, a man hopped out and, referring to a street gang's name, asked them, "How's that Brim life?"  Immediately afterwards he shot at them.  J.R. ran, and the only impression she got of the shooter was that he was African-American and wore all black clothing.  When J.R. returned to the crime scene, she saw that Benton had been shot.

Benton died that night.  A medical examiner testified his manner of death was homicide caused by multiple gunshot wounds.

*April 15 Shooting*

At trial, B.T. testified regarding the April 15 shooting that at around 2:00 a.m. on that day, he and a friend were standing out on the street.  A man drove up near them, got out of his car and, referring to a street gang, said: "This is Crip; this is Crip," and shot B.T. in the foot.  B.T. ran but then stopped.  He saw the car turn around and head toward him in the wrong direction of a one-way street.  Shortly afterwards, B.T.'s friend picked him up in a vehicle and while they were going to the hospital, police stopped them. That night, B.T. described the shooter and his attire to police.

The jury viewed security camera video of the incident in which the shooter was seen firing a gun and running away.  Because of a birth defect, Peavy has no left hand.  A homicide detective testified that after watching the video several times, he did not see the shooter's left hand.

*Police Investigation*

On May 10, 2014, police arrested Peavy as he was leaving a gathering of the "5-9 Brim" street gang.  At the time, he was driving the same vehicle used in the April 15 shooting.  That vehicle was rented by Peavy's girlfriend, who sometimes loaned it to Peavy.  Police searched Peavy's apartment and found a digital scale with some white residue on it, a nine-millimeter Taurus handgun, a .22-caliber bullet, a sweatshirt worn by the shooter in the April 15 incident, a black ski mask, a ballistic vest, and a pair of gloves that Peavy was seen wearing in other photos the police found on his phone.

A criminalist compared the bullets found in the firearm located in Peavy's room to the spent cartridges found at four different crime scenes, including that of the Benton shooting, and concluded the cartridges had characteristics that were consistent with them being from Peavy's firearm.

The probation report lists Peavy's race as African-American.  DNA extracted from the shell casings recovered from the Benton crime scene matched Peavy's DNA.  DNA extracted from the sweatshirt found in Peavy's room matched that of three people, including Peavy as a possible major contributor.  That sweatshirt also tested positive for gunshot residue.

A detective testified as a gang expert that Peavy was a member of a subset of the 5-9 Brim criminal street gang.  Based on a hypothetical mirroring the facts of Benton's shooting, the expert opined that the crime would have been carried out in association with and for the benefit of the street gang, which needed to recover its respect on the streets.  The parties stipulated that the 5-9 Brim is a criminal street gang as defined in the Penal Code.

*Defense Case*

A detective testified as a gang expert that Victor Ware, a 5-9 Brim gang member, was convicted of shooting a victim in West Coast Crips' territory in March 2014.  Shell casings recovered from that crime scene were similar to the casings found in the present case; specifically, they were nontoxic bullets produced by the same manufacturer.  Ware and Peavy were friends.

Peavy's girlfriend testified that in April 2014, she sometimes loaned her rental car to Peavy and other friends and family members who had gang associations.

Reginald Washington, a former gang member, testified as a gang expert that gang members sometimes shared guns and ammunitions. They also kept their weapons in different hiding places.

(ECF No. 19-21 at 3-5.)

## III.  CLAIMS IN THE SECOND AMENDED PETITION

(1)  The introduction of evidence of the April 15 shooting for which Petitioner had already been convicted in a separate proceeding violated his federal right to due process because, notwithstanding the jury instruction that it was introduced for the limited purpose of showing identity, intent and motive, it was cumulative to trial evidence on those issues and amounted to a piling on of unnecessarily prejudicial evidence which rendered his trial fundamentally unfair.  (ECF No. 13 at 40-53.)

(2)  The denial of Petitioner's unequivocal post-trial request for self-representation as untimely without an inquiry or findings as to whether the proceedings would have been disrupted or to grant a continuance to develop his ineffective assistance of counsel claims violated his federal constitutional right to self-representation.  (*Id*. at 54-62.)

(3)  The introduction of an adopted admission contained in a partially unintelligible recording of a jail conversation where Petitioner tells his co-defendant their DNA was found on bullet casings recovered at the crime scene and failed to respond when his co-defendant said they had messed up, was more prejudicial than probative resulting in a fundamentally unfair trial.  (*Id*. at 63-65.)

## IV.  DISCUSSION

### A.    Standard of Review

Title 28, United States Code, § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to a claim adjudicated on the merits in state court, that in order to obtain federal habeas relief a petitioner must demonstrate that the state court adjudication of the claim:

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Even if § 2254(d) is satisfied, a petitioner must show a federal constitutional violation occurred to obtain habeas relief. *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007); *Frantz v. Hazey*, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. 415, 427 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011). To satisfy § 2254(d)(2), the factual findings upon which a state court's adjudication rests must be objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

When a federal habeas court addresses a claim which has not been adjudicated on the merits in state court, pre-AEDPA de novo review is required. *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002). Under such a review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc).

## B.    Claim One

Petitioner alleges in claim one that his federal due process rights were violated by the introduction of evidence of the April 15 shooting which took place three days after the April 12 shooting for which he was on trial, because it was more prejudicial than probative. (ECF No. 13 at 40-53.)  He argues, as he did in state court, that the jury heard evidence he committed the April 15 shooting, and although they were instructed the evidence was admitted as probative of and limited to the issues of identity, intent and motive, it was entirely cumulative to trial evidence on those issues and therefore amounted to a piling on of unnecessarily prejudicial evidence.  (*Id.*)

Respondent answers that the denial of this claim by the state appellate court cannot be contrary to or an unreasonable application of clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1) because there is no clearly established federal law supporting a claim that the introduction of propensity evidence in a state criminal trial can violate federal due process.  (ECF No. 18-1 at 4.)  Petitioner replies that the state court adjudication, on the basis that the evidence did not satisfy the definition of prejudice under state law, which includes "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues," is contrary to or an unreasonable application of federal evidentiary rules precluding the introduction of evidence which is more prejudicial that probative, and federal law which provides that the introduction of overly prejudicial evidence can violate federal due process where it renders a state criminal trial fundamentally unfair.  (ECF No. 23 at 9-16.)

Petitioner presented this claim to the state supreme court in his petition for review. (ECF No. 19-22), which was denied with an order which stated: "The petition for review is denied."  (ECF No. 19-33.)  The same claim was presented to the state appellate court on direct appeal (ECF No. 19-19) and denied in a written opinion.  (ECF No. 19-21.)

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).  The Court will look through

the silent denial by the state supreme court to the appellate court opinion on direct appeal, which stated:

> Peavy contends the court erroneously admitted evidence regarding the April 15 shooting and such evidence was substantially more prejudicial than probative; thus, the court violated his due process rights under the federal Constitution.

*A.   Background*

The People moved in limine to admit into evidence testimony regarding the April 15 shooting, arguing it was relevant to prove intent, motive and identity.  Peavy opposed the motion, arguing the evidence was not admissible to show a common design, plan or scheme, knowledge or identity, and it was excludable under Evidence Code section 352.  In granting the motion, Judge Rogers ruled: "The People's theory is that Mr. Peavy committed the crimes that he is charged with on April 12 and then three days later that he did this other shooting for which he has been found guilty at a jury trial.  The other shooting has a number of similarities. . . . [¶]  A jury has found beyond a reasonable doubt that Mr. Peavy committed the April 15 incident. . . . (¶) That is one of the factors, I think, that goes into the probative value side of the equation.  That's common sense. . . . [¶]  Next, I think that [the prosecutor] has proffered intent and motive for committing the crime.  The motive seems inextricably tied in with the gang culture.  [The prosecutor] also suggests identity.  And, frankly, I had thought common plan or scheme, even though I realize [the prosecutor] didn't really brief that.  [Defense counsel] briefed it in opposition."

The court concluded that under Evidence Code section 352, the probative value of the April 15 shooting was "exceptionally high.  And I think that it goes to, frankly, the intent with which the act on [April] 12th, our charged counts, were committed.  I think it is exceptionally strong in terms of the gang motive for committing these crimes.  And, frankly, I am mindful that just under [Evidence Code section 1101, subdivision (b)], the degree of similarity required for identity is the highest degree of similarity.  But I think this passes muster for identity as well."

Defense counsel again opposed the admission of evidence about the April 15 shooting before the trial judge, Judge Fraser, who rejected those arguments, ruling:  "[H]ere, we have similar acts.  And the idea is you have similar acts with similar intent.   And obviously, murder has an intent requirement to it. . . . [¶]  We also have motive which is really important,

especially in a gang context, where you can use the gang membership at times to show a motive for a particular murder or a motive for a particular shooting." Judge Fraser continued: "[W]e have more than enough to show plan. We have more than enough to show intent. And we have more than enough to show motive. [¶] The next part of this obviously is - so we have the materiality, first prong. Clearly, it's relevant. And it's something that would help the jurors do their job." Judge Fraser concluded that under Evidence Code section 352, evidence of the April 15 shooting was substantially probative and not prejudicial to Peavy. He further concluded that the jury would not be misled because the charged crimes and the April 15 shooting were separate incidents.

At trial, just before B.T. testified about the April 15 shooting, the court gave the jury the following limiting instruction: "The People will present evidence that the defendant committed another offense that was not charged in this case. You may consider this evidence only if you thought [it] proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. [¶] Proof by preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide the defendant committed the uncharged offense, you may but are not required to consider that evidence for the limited purpose of deciding whether or not, (a), identity, or the defendant was the person who committed the offense alleged in this case or, intent, the defendant acted with the intent to commit murder in this case or, motive, defendant had a motive to commit the offense alleged in this case or, common plan, the defendant had a plan or scheme to commit the offense alleged in this offense. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense. Do not consider this evidence for any other purpose. Do not conclude from this evidence the defendant has a bad character or is predisposed to commit crimes. [¶] If you conclude the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove the defendant is guilty of the crime charged in this case. The People must prove each charge - each charge or allegation beyond a reasonable doubt."

During final instructions, the court instructed the jury with CALCRIM No. 303: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

### B. *Applicable Law*

Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Thus, evidence of other crimes or bad acts is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a).) Evidence Code section 1101, subdivision (b) "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt, supra*, 7 Cal.4th at p. 393, fn. omitted.) Specifically, Evidence Code section 1101, subdivision (b) provides that nothing in that section "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

The admissibility of evidence under Evidence Code section 1101, subdivision (b) depends on the degree of similarity between the uncharged act and the charged offense. (*People v Zepeda* (2001) 87 Cal.App.4th 1183, 1210 (*Zepeda*), citing *Ewoldt, supra*, 7 Cal.4th at p. 402.) The California Supreme Court has explained that for evidence of uncharged acts to be admissible under Evidence Code section 1101, subdivision (b) to prove such facts as motive, intent, identity, or common design or plan, the charged offenses and uncharged acts must be "sufficiently similar to support a rational inference" of these material facts. (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt, supra*, 7 Cal.4th at p. 402.) To be admissible to prove intent, the uncharged misconduct need only be "sufficiently similar (to the charged offense) to support the inference that the defendant '"probably harbor(ed) the same (or similar) intent in each instance."'" (*Ibid*.; see *People v. Memro* (1995) 11 Cal.4th 786, 864-865 (evidence of defendant's uncharged conduct of possessing sexually explicit photographs of young males admissible as probative to show intent to sexually molest young boy).)

If the trial court determines that uncharged misconduct is admissible under Evidence Code section 1101, subdivision (b), it must then determine whether the probative value of the evidence is "'substantially outweighed by the probability that its admission (would) . . . create substantial danger of

undue prejudice, of confusing the issues, or of misleading the jury.'" (*Ewoldt, supra*, 7 Cal.4th at p. 404; Evid. Code, § 352.) "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses." (*Zepeda, supra*, 87 Cal.App.4th at p. 1211.) "The probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) "On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred." (*Ibid.*) "The potential for prejudice is decreased . . . when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense." (*Ibid.*)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '(A)ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying (Evidence Code) section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

We review the trial court's rulings under Evidence Code sections 1101 and 352 for an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) We will not disturb the trial court's exercise of discretion except upon a showing that it "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

*C.  Analysis*

We conclude the two judges who ruled on this issue did not abuse their discretion or violate Peavy's federal constitutional due process right to a fair trial by admitting under Evidence Code section 1101, subdivision (b) the evidence that Peavy committed the April 15 shooting. That evidence was material and highly probative on the issues of his intent and motive with respect both to the substantive charges of murder and attempted murder and the gang and firearm allegations.

As already discussed, the least degree of similarity between an uncharged act and a charged offense is required in order to prove intent, and - to be admissible to prove intent - the uncharged misconduct need only be sufficiently similar to the charged offense to support the inference that the defendant probably harbored the same or similar intent in each instance. (*Ewoldt, supra*, 7 Cal.4th at p. 402; see *People v. Memro, supra*, 11 Cal.4th at pp. 864-865.)  Although motive normally is not an element of any crime, evidence of motive is always relevant because it "'makes the crime understandable and renders the inferences regarding defendant's intent more reasonable.'"  (*People v. Riccardi* (2012) 54 Cal.4th 758, 815, abrogated on another point by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Here, during both the charged crimes and the April 15 shooting, Peavy acted similarly: either late night or early morning, he was in a vehicle that approached individuals on the street; he got out of the vehicle; he made a gang reference to the individuals, and, unprovoked, fired shots at them.  Here, as in *Zepeda, supra*, 87 Cal.App.4th 1183, the evidence of Peavy's other gang-related assault with a firearm in response to minimal or nonexistent confrontation, provocation, or challenge to Peavy's gang was relevant and admissible to prove his motive and intention to engage in hostile action against a perceived rival gang member for no reason other than to benefit or promote his gang and his own gang reputation, and to "'follow the dictates of the gang . . . to pursue gang policy.'"  (*Id*. at p. 1211.)  The similarity requirement is met because the evidence showed the April 15 shooting incident occurred a few days after the charged crimes, and it was gang-related and sufficiently similar to the charged crimes to support the inference that Peavy probably harbored the same or similar intent, and in each instance acted with a similar motivation.  (See *Ewoldt, supra*, 7 Cal.4th at p. 402.)  [Footnote: To the extent Peavy argues the court erred by admitting evidence of the April 15 shooting on the question of identity, any error was harmless in light of the fact that the evidence was plainly admissible on motive and intent.]

Under Evidence Code section 352, testimony regarding the April 15 shooting was substantially more probative than prejudicial.  Peavy had been convicted of the April 15 shooting in separate proceedings, and the source of information regarding it was independent of the source regarding the charged offense.  The court concluded the testimony would not confuse the jury or consume undue time.  Moreover, we point out the court's limiting instruction further minimized any prejudice to Peavy.   Also, contrary to Peavy's contention that the video made the evidence of the April 15 shooting more prejudicial than the charged crime, we point out that the charged crime evidence was more serious because it involved a death, while the uncharged crime did not.

(ECF No. 19-21 at 5-13.)

Claims based on state evidentiary rulings are not cognizable on federal habeas unless the admission or exclusion of the evidence was so prejudicial it rendered a trial fundamentally unfair.  *Estelle v. McGuire*, 502 U.S. 62, 70-73 (1991); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996).  "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'"  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)).

The determination by the trial judge that the proffered testimony was relevant and not prejudicial under state law is entitled to deference in this Court.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.")  Nevertheless, "[t]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."  *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness."); *see also*

*Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989) (holding that a federal habeas court must defer to the state court's construction of state law unless it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation.")

Respondent correctly argues Petitioner cannot rely on that foregoing federal law in this instance. The Ninth Circuit has held that because the United States Supreme Court in *Estelle v. McGuire* specifically reserved ruling on the issue regarding whether introduction of propensity evidence in a state criminal trial could violate federal due process, and has denied certiorari at least four times on the issue since, there is no "clearly established federal law" applying to such a claim, thereby precluding habeas relief where 28 U.S.C. § 2254(d)(1) applies. *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006). Although the jury was instructed not to consider the April 15 shooting as evidence Petitioner "has a bad character or is predisposed to commit crimes," the state court adjudication of this claim cannot be contrary to or an unreasonable application of clearly established federal law regarding introduction of prejudicial evidence other than propensity evidence. *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (recognizing that although the admission of irrelevant and prejudicial evidence rendered the trial fundamentally unfair under Ninth Circuit precedent, federal habeas relief was unavailable under 28 U.S.C. § 2254(d)(1) because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."); *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (holding that a state court could not have unreasonably applied federal law if no clear Supreme Court precedent exists).

Although Petitioner cannot satisfy 28 U.S.C. § 2254(d)(1) because there is no clearly established federal law applicable to claim one, he may still obtain federal habeas relief if he can demonstrate the state court adjudication of his claim involved an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(2). However, he has not identified an objectively unreasonable factual determination by the state court with respect to claim one. *See Miller-El*, 537 U.S. at 340 (holding that to satisfy § 2254(d)(2),

a petitioner must show that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable).

Finally, even assuming Petitioner could satisfy or avoid the operation of 28 U.S.C. § 2254(d)(1) or (2), he would still be required to demonstrate a federal constitutional violation occurred by showing his trial was rendered fundamentally unfair by the introduction of evidence of his involvement in the other shooting. *Fry*, 551 U.S. at 119-22; *Frantz*, 533 F.3d at 735-36; *McGuire*, 502 U.S. at 70-73. To do so he would have to show "there are no permissible inferences the jury may draw from the evidence." *Jammal*, 926 F.2d at 920. "Even then, the evidence must be of such a quality as necessarily prevents a fair trial," which requires a showing that it is of the type the jury could use for an improper purpose. *Id*. (quoting *Kealohapauole*, 800 F.2d at 1465).

As pointed out by the state appellate court, Petitioner was not prejudiced by the introduction of the highly material and relevant evidence because it: (1) came from a source independent of the evidence and witnesses at trial; (2) carried the assurance of accuracy provided by a jury trial; (3) was introduced with repeated instructions to the jury to consider it for the limited purpose of establishing identity, motive or intent; (4) involved a non-fatal shooting of a victim with one shot in the foot, a less serious offense than the fatal shooting Petitioner was on trial for where the victim was shot at least six times, including in the stomach, back, thighs and shins (ECF No. 19-11 at 121-27); and (5) was highly relevant due to the similarities between the two offenses, including that Petitioner approached individuals in a vehicle late night or early morning, got out of his vehicle, made a gang reference to the individuals, and, unprovoked, fired shots at them. The evidence introduced at trial showed that: (1) Petitioner's DNA was found on shell casings recovered at the April 12 murder scene (*id*. at 145-47); (2) shell casings recovered at the scene of both shootings were fired from the gun found in Petitioner's bedroom and matched an unspent shell casing found in his bedroom (ECF No. 19-13 at 18-27); (3) the sweatshirt worn by the shooter on April 15 as seen on videotape of the shooting was found in Petitioner's bedroom containing gunshot residue and his DNA (ECF No. 19-11 at 71-76, 157-58; ECF No. 19-12 at 126-

27); and (4) he was driving the vehicle used in the April 15 shooting when he was arrested, which was rented by his girlfriend (ECF No. 19-12 at 168-69).  The defense countered with testimony from Petitioner's girlfriend that she allowed other gang members to drive her car, as well as expert testimony that similar shell casings were found at the scene of a gang shooting a month earlier committed by Petitioner's friend and fellow gang member and that gang members share weapons and ammunition.  (ECF No. 19-14 at 65-68, 83-89.)

Based on the numerous connections between the two shootings, the jury could have drawn permissible inferences regarding identity, intent, and motive.  That itself precludes a finding of fundamental unfairness.  *Jammal*, 926 F.2d at 920.  Even if that hurdle could be overcome, in light of the jury instruction that the prior offense be used for the limited purpose of establishing identity, motive or intent, it was not the type of evidence the jury could have used for an improper purpose.  *See McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993) (noting that character evidence is the type of evidence from which no permissible inference may be drawn); *Dowling v. United States*, 493 U.S. 342, 353-54 (1990) (holding that introduction of prior criminal acts did not violate federal due process where trial court properly weighed probative value against prejudice, and reiterating that the category of infractions which violate "fundamental unfairness" has been defined "very narrowly.")

Accordingly, federal habeas relief is denied as to claim one because the state court adjudication is neither contrary to, nor involves an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d)(1)-(2).  Even assuming Petitioner could satisfy those standards, federal habeas relief is unavailable because the introduction of evidence of his prior shooting offense did not render his trial fundamentally unfair so as to violate federal due process.

/ / /

/ / /

/ / /

## C.    Claim Two

Petitioner alleges in claim two that the denial of his unequivocal *Faretta* motion as untimely without an inquiry or findings concerning how the request would have disrupted or delayed the proceedings, or whether a continuance should have been granted to allow him to develop his ineffective assistance of counsel claims, violated his federal constitutional right to self-representation.   (ECF No. 13 at 13, 54-62.)

Respondent answers that the state court adjudication of this claim, on the basis that the trial judge correctly determined the motion was untimely, is neither contrary to nor an unreasonable application of clearly established federal law which provides that a *Faretta* motion is timely if made weeks before trial.   (ECF No. 18-1 at 6-7.)   Respondent also contends that even if an error occurred it was harmless because Petitioner sought to raise issues irrelevant to sentencing.   (*Id.* at 7-8.)   Petitioner replies that the state court adjudication of claim two is contrary to or an unreasonable application of federal law which requires certain findings must be made and placed on the record when denying a *Faretta* motion.  (ECF No. 23 at 17-18.)

As with claim one, the Court will look though the silent denial of this claim by the state supreme court to the appellate court opinion, which stated:

> Peavy contends the court erroneously denied his *Faretta* motion, thus depriving him of his right to self-representation.  Peavy contends his request for self-representation was unequivocal and the court "made no finding concerning how [his] presentencing self-representation request would have disrupted the proceedings at that stage of the case."

> He further argues that while he did not specifically say so at the motion hearing, his statements reflected that he was arguing for a new trial on the grounds of ineffective assistance of counsel.

> *A.  Background*

> On September 6, 2016, the day scheduled for sentencing, Peavy requested to represent himself.  [Footnote: Specifically, Peavy told the court: "I'd present a motion to go pro per on September 6, 2016.  Or soon after petition [sic], Emanual Peavy will move to the court [sic] dismiss his attorney,

your Honor, for the motion will be made on grounds causing [sic] for calling for dismissal of defendant's appointed counsel as expressed in *Faretta v. California*.  [¶] It is the defendant's constitutional right of self-representation and may waive the right to counsel in a criminal case, *Faretta v. California*."] The court cleared the courtroom and asked Peavy, "What do you want?  This is a [hearing under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)].  So [it] essentially means you want to fire your lawyer."  Peavy agreed and explained that his trial counsel "didn't mitigate at all.  So I have no recommendation letters or anything.  My family couldn't contact [defense counsel]."

The court explained the sentence was mandated by law and the court did not have much discretion in sentencing him: "The only thing I really have discretion at is a triad on the attempt murder [five, seven, or nine years].  Other than that, really there's nothing."  Peavy responded that he understood that, adding: "But there's a lot of things that I want to get together and show you.  [¶]  I mean, it's a – it's ineffective counsel, for one, leading, impeachment.  I don't know if it's probably corruption.  There's a lot going on in the trial."  The court replied: "I actually was very impressed with [defense counsel].  He focused on what needed to be focused on.  And the defense of essentially that gangs pass the guns around, that made a lot of sense to me.  You know, in a sense, it's a whodunit.  You got DNA.  So you've got to explain away the DNA somehow because in the modern world, DNA trumps everything.  It just does."  After listening to Peavy's additional complaints about his defense counsel, the court denied the *Marsden* motion.  Peavy told the court: "It's not a *Marsden*.  I'm wishing to go pro per.  I mean, I'm going to get whatever I get anyways."  In response, the court separately denied that *Faretta* motion as untimely. Peavy proceeded to complain to the court about his defense counsel's trial performance.  The court told him: "I'm not here [to] relitigate your trial."  Immediately after that proceeding, the court sentenced Peavy to the same term recommended by the probation officer.

## B.  Applicable Law

Under the Sixth Amendment of the United States Constitution, defendants have a right to represent themselves in criminal trials.  (*Faretta, supra*, 422 U.S. at p. 819.)  "On appeal, a reviewing court independently examines the entire record to determine whether the defendant knowingly and intelligently invoked his right to self-representation."  (*People v. Doolin* (2009) 45 Cal.4th 390, 453.)  A legitimate concern of the trial court is whether defendant's request is untimely and would needlessly delay trial.  (*Id*. at p. 454.)  A motion made after the guilt phase is untimely and subject to the trial

court's discretion.  (*Ibid*., citing *People v. Mayfield* (1997) 14 Cal.4th 668, 810.)  "Much as a request to represent oneself at trial must be made a reasonable time before trial commences, the request for self-representation at sentencing must be made within a reasonable time prior to commencement of the sentencing hearing."  (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1024.)

## C. Analysis

Peavy brought his motion just before the sentencing hearing began; therefore, it was untimely.  Although the court did not elaborate on its reasons for the denial beyond stating it was untimely, we conclude that on this record no more explanation was needed.  Peavy had indicated that he needed to gather records to support his arguments about trial counsel's purported errors made at trial.  Peavy presumably would have needed a continuance for that purpose.  The court could have reasonably decided that such delay in sentencing would have served no purpose.  As the court stated, the sentencing hearing was not the venue for relitigating defense counsel's trial performance.  We conclude the court did not abuse its discretion in denying Peavy's untimely motion.

(ECF No. 19-21 at 13-16.)

Clearly established federal law provides that in order to properly invoke the right to self-representation encompassed in *Faretta*, a criminal defendant's request must be knowing, intelligent, unequivocal, timely, and not made for the purpose of delay.  *United States v. Maness*, 566 F.3d 894, 896 (9th Cir. 2009).  The only guidance provided by the Supreme Court regarding timeliness of a *Faretta* motion provides that a motion made "weeks before trial" is timely.  *See Stenson v. Lambert*, 504 F.3d 873, 884-85 (9th Cir. 2007) (noting that *Faretta* "indicates only that a motion for self-representation made 'weeks before trial' is timely.")  The Ninth Circuit has held that "[b]ecause the Supreme Court has not clearly established when a *Faretta* request is untimely, other courts are free to do so as long as their standards comport with the Supreme Court's holding that a request 'weeks before trial' is timely."  *Marshall v. Taylor*, 395 F.3d 1058, 1061 (9th Cir. 2005).  As quoted above, the appellate court noted that California law provides that a request for self-representation at sentencing must be made at a reasonable time prior to the sentencing

hearing.  (ECF No. 19-21 at 16.)  The state appellate court adjudication of claim two on the basis that Petitioner's post-trial *Faretta* motion was untimely is not contrary to or an unreasonable application of clearly established federal law regarding timeliness.  *Id*.

Petitioner contends the trial judge violated clearly established federal law requiring a record be made of an inquiry into whether an untimely motion would delay or disrupt the proceedings, and that the trial court should have construed his motion as a motion for a new trial based on ineffective assistance of counsel.  *Faretta* provides that in order to "knowingly and intelligently" relinquish the benefits of representation by counsel, a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with open eyes.'"  *Lopez v. Thompson*, 202 F.3d 1110, 1117 (9th Cir. 2000) (quoting *Faretta*, 422 U.S. 835).  Petitioner does not contend there is an insufficient record that he was provided with sufficient information at his *Faretta* hearing for him to make the choice of relinquishing counsel knowingly and intelligently.  In fact, his pre-trial *Faretta* motion was granted and he represented himself briefly prior to trial before counsel was re-appointed at his request, and he made three *Marsden* motions prior to trial and two during trial.  (ECF No. 19-1 at 170, 185-86, 190, 192, 199, 209, 222.)

Rather, Petitioner contends the record should reflect that the trial judge considered whether the proceedings would be unduly disrupted before finding the motion was untimely and should have considered giving him a continuance to develop his claims of ineffective assistance of counsel.  The Ninth Circuit has held, in the context of a petitioner convicted in state court seeking federal habeas relief, that: "Neither the Constitution nor *Faretta* compels the district court to engage in a specific colloquy with the defendant. Because we cannot impose a procedural framework on state courts unless compelled by the Constitution, we need not address whether the suggested colloquy was followed here." *Lopez*, 202 F.3d at 1117 (citing *Smith v. Phillips*, 455 U.S. 209, 221 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.")).  Petitioner has failed to identify any clearly

established federal law which required the trial judge to inquire into or make a record of the reasons for denying his clearly untimely post-trial *Faretta* motion or allowing him a continuance to develop his ineffective assistance of counsel claims, which the trial judge in any case addressed by complementing defense counsel's representation.  *Id.*; *see e.g. Whaley v. Thompson*, 2000 WL 84364, at *3 (9th Cir. 2000) (unpublished memorandum) (holding with respect to contention that state trial judge failed to make inquiry during *Faretta* colloquy regarding defendant's dissatisfaction with his attorney, "[o]ur Circuit has not imposed such a rule, and it is not commanded by clearly established Federal law, as determined by the Supreme Court of the United States, as required under federal habeas law."), citing 28 U.S.C. § 2254(d)(1).  Finding no *Faretta* error, the Court will not address Respondent's contention that any error is harmless because it did not affect sentencing. *See Frantz*, 533 F.3d at 734 (holding that *Faretta* error is structural and not susceptible to harmless error analysis) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)).

Finally, although Petitioner agreed with his trial counsel and the trial judge at his *Faretta* hearing that his sentence was mostly mandated by state law with very little discretion (*see* ECF No. 19-19 at 3-4), the state appellate court noted, he "argues that while he did not specifically say so at the motion hearing, his statements reflected that he was arguing for a new trial on the grounds of ineffective assistance of counsel."  (ECF No. 19-21 at 13.)  The state court did not treat this contention as a separate claim, and Petitioner did not raise it as a separate claim in state court or in his Second Amended Petition here. Even if he had, or does, the decision whether to grant a motion for a new trial is controlled by California law.  *See* Cal. Evidence Code § 1181.  Petitioner has not alleged a violation of federal law or the federal constitution resulting from the failure of the trial judge to construe his post-trial *Faretta* motion as a motion for a new trial.

Federal habeas relief is denied as to claim two because the state court adjudication is neither contrary to, nor involves an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d)(1)-(2).

### D.    Claim Three

In the third and final claim of the Second Amended Petition, Petitioner claims that the introduction of a partially unintelligible audio recording resulted in a fundamentally unfair trial because: (1) it is impossible to know what the jury heard due to the poor quality of the recording and they may have relied on the transcript provided by the prosecutor to find an adopted admission which did not occur, (2) even if an adopted admission was made it was more prejudicial than probative, and (3) the poor sound quality rendered meaningful appellate review impossible.  (ECF No. 13 at 13, 63-65.)  Petitioner is referring to a surreptitious recording of a conversation between him and his co-defendant in a jail cell where he told his co-defendant their DNA had been found on shell casings at the crime scene, prompting his co-defendant to say: "No doubt we fucked up, homie," to which Petitioner did not respond.  (ECF No. 19-5 at 29.)  The trial judge allowed the evidence to be introduced as an adoptive admission over defense counsel's objection that it was not clear what prompted the co-defendant to make the quoted statement, or whether or not Petitioner responded, since the vast majority of the recording of their whispered conversation was inaudible and the jury might be misled by the lack of clear recording, particularly if the prosecution was allowed to prepare a transcript based on their interpretation as to what was said.  (*Id*. at 30-37.)

When the recording was played for the jury they were given a transcript, which the trial judge noted is required by state law (ECF No. 19-12 at 28-37), which is in the record.  (ECF No. 19-2 at 39-51.)  Defense counsel objected that the transcript was unauthenticated, and the trial judge responded by instructing the jury: "The transcript is there to aid you; all right?  The evidence is actually the tape itself.  So if there's a conflict between the audio and the transcript, go with the audio; okay?"  (ECF No. 19-12 at 30-31.)  Defense counsel argued in closing that because the statement was made in the context of the two men being arrested and sitting together in a jail cell they were likely talking about messing up their lives in general, not specifically about their DNA being found on the shell casings.  (ECF No. 19-15 at 38-39.)

Respondent answers that Petitioner has not presented this claim to any state court. Respondent adds that although it is likely procedurally defaulted here and in the state court by his failure to raise it on direct appeal, state court remedies remain available within the meaning of the federal exhaustion doctrine. This is because the state supreme court has discretion to reach the merits of the claim even if Petitioner were to present it at this late date. (ECF No. 18-1 at 5-6.) Respondent argues the claim should be denied notwithstanding the failure to exhaust because it is plainly meritless since the jury could have drawn a permissible inference of consciousness of guilt from evidence Petitioner was aware he and his co-defendant had made a mistake leaving shell casings containing their DNA at the crime scene, thereby acknowledging involvement in the shooting. (*Id.* at 6.)

On February 21, 2020, before the Answer was filed, Petitioner filed an untitled document in which he states he did not exhaust state court remedies with respect to claim three, is "expressing to the courts to withdraw" the claim, and concludes: "So I would like to go up the ladder on state remedies so I would like to withdraw [the claim]." (ECF No. 17 at 1.) There has been no ruling on Petitioner's request.

The Court is required to liberally construe Petitioner's pro se submissions both here and in the state court, especially as to which claims are presented. *Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001). To the extent Petitioner's document could be liberally construed as a request to withdraw claim three from the Second Amended Petition and stay this action while he returns to state court to exhaust, he would be required to show the claim is not "plainly meritless." *Dixon v. Baker*, 847 F.3d 714, 722 (9th Cir. 2017) (quoting *Rhines v. Weber*, 544 U.S. 269, 277 (2005)). A claim is plainly meritless where "it is perfectly clear that the petitioner has no hope of prevailing." *Id.* (quoting *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005)). That same standard applies to whether this Court can deny an unexhausted claim on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."); *Cassett*, 406 F.3d at 623-24 (holding that a claim may be denied under 28 U.S.C.

§ 2254(b)(2) only where "it is perfectly clear that the petitioner has no hope of prevailing," as "[a] contrary rule would deprive state courts of the opportunity to address a colorable federal claim in the first instance and grant relief if they believe it is warranted.")

As discussed with respect to claim one, for Petitioner to prevail on a claim alleging the improper admission of evidence at his trial he must show its admission rendered his trial fundamentally unfair. *See Holley*, 568 F.3d at 1101 ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.")  Evidence does not render a trial fundamentally unfair unless "there are no permissible inferences the jury may draw from the evidence." *Jammal*, 926 F.2d at 920.  "Even then, the evidence must be of such a quality as necessarily prevents a fair trial," which requires a showing that it is of the type the jury could use for an improper purpose. *Id*. (quoting *Kealohapauole*, 800 F.2d. at 1465).

Petitioner does not dispute that the jury could have drawn a permissible inference that he was involved in the shooting *if in fact* he failed to respond when his co-defendant said they had messed up, and *if in fact* his co-defendant's statement was made in response to Petitioner informing him their DNA was found on shell casings at the scene.  Rather, he argues the recording of their conversation was of such a poor quality that the jury might have relied on the prosecution's transcript rather than the recording itself to find he did not respond to his co-defendant's statement or find it was Petitioner's statement that their DNA was on the shell casings which prompted his co-defendant to make the statement about messing up.  However, the jury was instructed that the recording, not the transcript, was the evidence available for them to consider, if they wished to consider it at all, and that any discrepancies between the two were to be resolved in favor of the recording.  (ECF No. 19-12 at 30-31.)  They were also instructed that Petitioner could not be convicted based on his out-of-court statements alone.  (ECF No. 19-14 at 127.)  The jury is presumed to have followed the instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  In addition, defense counsel argued in closing that the statement: "No doubt we fucked up, homie" was made in the context of the two men having been arrested and sitting in a jail cell having

messed up their lives generally, not specifically about their DNA being found on the shell casings.  (ECF No. 19-15 at 38-39.)

Petitioner's argument would require a finding the jury did not follow the simple and straightforward instruction that the recording was the evidence of the conversation and not the transcript, and that any discrepancy between the two were to be resolved in favor of the recording.  *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (applying "the almost invariable assumption of the law that jurors follow their instructions.")  That presumption can be rebutted where Petitioner shows "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135 (1968) (finding that "powerfully incriminating extrajudicial statements of a codefendant" with "inevitably suspect" credibility were devasting to the defense).  Petitioner has not, and cannot, make such a showing here.  The risk the jury could not or would not follow their instruction is low, as the instruction was simple and straightforward.  The consequence of their failure to do so, which is the possibility they would consider evidence not heard in the recording that Petitioner silently adopted his co-defendant's admission they messed up by allowing their DNA to be found at the scene, was not vital to the defense.  The jury already had before them overwhelming evidence of Petitioner's involvement in the shooting for which he was on trial, including his DNA on shell casings found at the scene which had been fired from the gun found in his bedroom. In addition, the defense dealt with the evidence of the adopted admission by arguing it was not about having left DNA at the scene but about messing up their lives in general, and with evidence that similar shell casings were found at the scene of a gang shooting a month earlier committed by Petitioner's friend and fellow gang member, and that gang members share weapons and ammunition.

Furthermore, even if the evidence rose to the level of a federal due process violation, any error would be harmless unless it had a substantial and injurious effect or influence on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *Williams v. Stewart*, 441

1   F.3d 1030, 1039 (9th Cir. 2006) (applying *Brecht* harmless error test to due process claim

2   based on introduction of suggestive pretrial identification).  The evidence that Petitioner

3   adopted his co-defendant's admission they had messed up because shell casings were found

4   at the scene with their DNA was overshadowed by the fact that Petitioner's DNA was

5   actually found on the shell casings at the scene fired from the firearm recovered from his

6   bedroom, and by the evidence he used the same gun three days later to commit a gang

7   shooting under nearly identical circumstances.  Any error in the admission of the evidence

8   is clearly harmless.

9        Finally, although unclear, the third claim in the Second Amended Petition appears

10  to allege meaningful appellate review is impossible because the audio recording is

11  unintelligible.  (ECF No. 16 at 63.)  Although the States have no federal constitutional

12  obligation to provide appellate review of criminal proceedings, once such review is

13  provided, a record insufficient to permit adequate and efficient appellate review can

14  infringe upon federal constitutional rights.  *See Griffin v. Illinois*, 351 U.S. 12, 18-20 (1956)

15  (holding that denial of free trial transcripts to indigent defendants violated due process and

16  equal protection); *Parker v. Dugger*, 498 U.S. 308, 321 (1991) (stating that the court has

17  "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the

18  death penalty is not imposed arbitrarily or irrationally.")  The trial judge here stated that

19  the California Rules of Court require a transcript be prepared so the record on appeal would

20  contain a written record of the recording played in court as a convenience to the appellate

21  court since the court reporter does not transcribe such recordings, but acknowledged the

22  recording would be available to the appellate court if necessary.  (ECF No. 19-12 at 36.)

23  Because the recording and transcript were available to the appellate court, Petitioner's

24  contention that his federal constitutional rights were violated because the audibility of the

25  recording was so poor it made meaningful appellate review impossible does not present a

26  colorable federal claim.

27       Accordingly, habeas relief is denied with respect to claim three in the Second

28  Amended Petition for failure to present a colorable federal claim irrespective of any failure

27

to exhaust state court remedies and irrespective of whether Petitioner intended to apply for a stay of this action while he returned to state court to exhaust.

### E.  Certificate of Appealability

"[T]he only question [in determining whether to grant a Certificate of Appealability] is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. ___, 137 S.Ct. 759, 773 (2017).  A Certificate of Appealability is not appropriate under that standard as to any claim in the Second Amended Petition.

## IV.  **CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Judgment be entered **DENYING** the Second Amended Petition for a Writ of Habeas Corpus and **DENYING** a Certificate of Appealability.

DATED: <u>August 17, 2020</u>

HON. MICHAEL M. ANELLO
United States District Judge

19cv0743-MMA (BGS)